OKLAHOMA STATE BANKING BOARD, Consisting of Carl B. Sebring, Bank Commissioner and Chairman of the Board, Kenneth G. Braley, Neil Dikeman, C. L. Northcutt, Members, and George T. Frame, Assistant State Bank Commissioner and Secretary of said Board, Plaintiffs in Error,

v.

Robert L. HICKS, Phillips R. Rhees, Newton M. Foster, Scott Beesley, Jr., and B. L. Wilson, Defendants in Error.

No. 41287.

Supreme Court of Oklahoma.

Feb. 8, 1966.

Rehearing Denied March 22, 1966.

Charles Nesbitt, Atty. Gen., W. J. Monroe, First Asst. Atty. Gen., for plaintiffs in error.

Garrison, Preston & Preston, by Denzil D. Garrison, Bartlesville, Bassman, Gordon, Mayberry & Lavender, by Jack E. Gordon, Claremore, for defendants in error.

BLACKBIRD, Justice.

This is an appeal from a judgment entered by the District Court in a proceeding, under Section 22, House Bill No. 865, enacted by the Twenty-Ninth Oklahoma Legislature (Chap. 371, S.L.1963, p. 704, 713; Tit. 75 O.S.1963 Supp., sec. 301 et seq.) commonly termed the "Administrative Procedures Act", and the rules and regulations promulgated by the State Banking Department on February 11, 1964, to review the "FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER", entered by the Banking Board of the State of Oklahoma, in the Matter of the Application of Robert L. Hicks, and others, to that Board for a charter for a proposed bank to be called the "State Bank of Catoosa, Oklahoma."

At the time of the subject application for the bank charter and the hearing thereon (which preceded enactment of the Oklahoma Banking Code of 1965, Tit. 6 O.S.1965 Supp., sec. 101 et seq.) the powers of this State's Banking Board, hereinafter referred to as the "Board", were prescribed in part by Tit. 6 O.S.1961, sec. 1, which reads, in part, as follows:

"* * * Said Board, in conjunction with the Bank Commissioner, shall have supervision and control of the issuing of Bank charters and the administration of the banking laws of the State not inconsistent with other specific declarations, provided by the Statutes. * *"

With reference to the procedure in such matters, our Statutes (Tit. 6 O.S.1961, sec. 55) provided, in part, as follows:

"Upon the filing of an application for a charter, the Bank Commissioner shall make, or cause to be made, a careful investigation and examination relating to the financial standing and character of the incorporators or organizers, the character and qualifications and experiences of the officers of the proposed banking institution, for the use of the Banking Board, * * *; the adequacy of the capital structure of said proposed banking institution; *the future earning possibilities of said proposed institution at the place of business designated in the application; and of the public necessity for the banking institution in the community in which such proposed banking institution is to be established and if the Bank Commissioner and the Banking Board,* after the hearing as herein provided, *shall determine any of such questions unfavorably* to such applicant, *the application shall not* be approved, * * *. (Emphasis ours.)

"* * *."

The investigation conducted by the Bank Commissioner (hereinafter referred to merely as the "Commissioner") as prescribed by the above quoted statute and part "II(c)" of the above cited rules and regulations, produced a report dated October 4, 1963, by the Board's investigator,

which began with a statement, in pertinent part, as follows:

"The proposed bank is to be located in Rogers County at Catoosa, Oklahoma, about midway between Tulsa and Claremore on U. S. Highway 66. It is approximately one mile northeast of the interchange at the south entrance to the Will Rogers Turnpike, and two miles northeast of the intersection of Highways #33 and #66 where Wagoner, Rogers and Tulsa Counties jointly meet. Its location is also about two miles west of the Verdigris River and the proposed head of navigation for the Arkansas River Water Transportation System which is scheduled for completion in 1970.

"The town of Catoosa had a census population of 405 in 1940, 438 in 1950 and 638 in 1960; the population is said to be 802 as of this time, and in a radius of five miles of Catoosa an estimated 5,000 people live. Two miles east of Catoosa is a new development of moderately priced homes.

"The Catoosa School District had an average daily attendance during the last year of 882, and is running at the rate of 1,100 for the current year. * * *

"In the town of Catoosa there are five churches and twenty businesses, of these twenty businesses I contacted all but one of them; this business was closed and *of these nineteen contacted only one said that they would not do business with the proposed bank,* their reason being that the proposed bank building would not be built on property owned by them. All were of the opinion that there was a need for a bank. In a radius of five miles there is a total of fifty-eight businesses; the major businesses are the McNabb Coal Co. and the Portland Cement Co., the balance is filling stations, grocery stores and cafes. There are

no banks in or around Catoosa, and the people are presently banking principally in Tulsa, Broken Arrow and Claremore, each about twelve miles distance.

"The proposed location is on the corner of Cherokee and Muskogee Streets, * * * in the original town of Catoosa * * *. The site is adjacent to the proposed new post office building. The bank building will be new and approximately 35 feet by 80 feet with drive-in facilities and night depository facilities. * * *

"As indicated in the formal application * * * it is proposed the Catoosa State Bank, Catoosa, Oklahoma will have as a capital structure at time of opening as follows:

| | |
|---|---|
| "Common Stock | 100,000.00 |
| "Surplus | 50,000.00 |
| "Undivided Profits | 50,000.00 |
| "Total | 200,000.00 |

"The common stock is to consist of 1,000 shares, par value $100.00 per share, to be sold at $202.00 per share. The proposed capital structure will meet the requirements of the State law.

\* \* \* \* \* \*

"The organizers of the proposed bank along with those whom I talked to in and around Catoosa *are hopeful* that *with the* opening of the bank, the economy of the area will be increased. Some new people are moving into the immediate trade area, but *most of* these people and *the people residing in the immediate* area, have accounts in banks in either Tulsa, Broken Arrow, Claremore or Owasso. Apparently all the deposits for the new bank would be obtained from existing banks within the trade territory of the new bank. * * *." (Emphasis ours.)

The part of the investigator's report that was headed: "Projections by Organizers" represented the total income and expenses

of the proposed bank, for the anticipated first three years of its operation as projected, predicted, or estimated by its organizers, would be as follows:

| "INCOME: | First Year | Second Year | Third Year |
|---|---|---|---|
| | ($)15,400.00 | ($)28,450.00 | ($)50,950.00 |
| * * * * * | * * * | * * * | |
| "Expenses | ($)30,950.00 | ($)35,000.00 | ($)40,300.00" |

———◆———

At the hearing before the Board and the Commissioner, testimony was elicited from Mr. Hicks and others, who were to be officers and directors of the proposed bank. Hicks confirmed that he had furnished the figures, shown in the investigator's report under "Projections by Organizers", and further testified that the figures shown as the proposed bank's estimated expenses for the first year of its operation were "low". He further testified that the projected expenses included nothing for rental of quarters for the bank, and he estimated this item of expense would amount to $350.00 or $400.00 per month. Hicks also opined that the bank would make no profit the first year, and that the organizers did not anticipate it would make any the second year, but that they believed it could "be operating in the black" its third year. He also corroborated the Investigator's Report that people now living in Catoosa do their banking at Claremore, Broken Arrow and Tulsa; and, as to the proposed bank's prospects for customers in that area, his testimony was, in part, as follows:

"MR. BRALEY: Have you made a survey in the area of possible customers of the bank? I believe you estimated around 5,000 population in a five mile area around the bank. Have you made any sort of survey of what customers you might expect from those 5,000?·

"THE WITNESS: The customers of the bank will be principally individuals, we are sure, inasmuch as at the present time there isn't a great deal of business

there. However, we did compile a list of all the businesses in the area and they were turned over to the investigator that came up to check our application. There was a list of the businesses and also a list of all the churches that was furnished to him.

"MR. BRALEY: But, you have not made any sort of survey of individuals who intend to use your bank?

"THE WITNESS: No, sir, other than those that did sign our petition indicating a desire for the bank and they indicated they would use it.

"MR. BRALEY: And that was how many?

"THE WITNESS: I believe there's 568 signatures on that petition. * *."

THE WITNESS: I believe there's 568 signatures on that petition. * * *."

The "FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER" promulgated by the Commissioner and the Board, after the close of the hearing, reads in part as follows:

"I.

*Findings of Fact*

* * * * * *

"4. That from the report of the Board's investigator and evidence adduced at the hearing the public necessity for the proposed Catoosa State Bank does not appear favorable at the present time.

"II.

*Conclusions of Law*

\* \* \* \* \* \*

"7. The economic conditions at the present time, in the location of the proposed banking institution, cause the future earning possibilities of the proposed bank to be very doubtful, and the provisions of law in connection with such future earning possibilities is not fully satisfied by the investigators report and the evidence adduced at the hearing.

"8. That the public necessity does not appear favorable for a banking institution in the City of Catoosa, Oklahoma, at the location proposed for the Catoosa State Bank, and the report of the examiner and evidence adduced at the hearing do not fully satisfy the provisions of law in regard to public necessity.

\* \* \* \* \* \*

"ORDER

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Banking Board and Bank Commissioner of the State of Oklahoma that the application of Robert L. Hicks, et al., for authority to engage in the banking business in the City of Catoosa, Oklahoma, under the name of Catoosa State Bank, should be, and the same is, hereby denied. \* \* \*."

Thereafter, on March 31, 1964, defendants in error, hereinafter referred to as "Petitioners", filed their "PETITION FOR REVIEW", against the Board and its members, in the District Court in Rogers County. In said petition the petitioners alleged, among other things, that the hereinbefore described denial of their application

"(3) \* \* \* was affected by various errors of law unsupported by substantial evidence, in view of the entire record as submitted, which errors of law and findings of fact have prejudiced the rights of Petitioners.

"(4) \* \* \* was arbitrary and capricious, which denial has prejudiced the rights of said Petitioners.

\* \* \* \* \* \*

"(6) That the findings \* \* \* is unsupported by substantial evidence in view of the entire record as submitted. \* \* \*."

When the petition for review came before the District Court for consideration, and, by apparent agreement of the parties, was submitted to it solely upon the record made at the hearing before the Board and the Commissioner, said Court, after taking the matter under advisement, entered a judgment in October, 1964, setting aside the hereinbefore quoted order of said Board and Commissioner denying the Petitioners' Application, and directing the Board and Commissioner to "forthwith issue a Charter of Authority to the Petitioners, authorizing them to engage in the banking business in the City of Catoosa, Oklahoma, under the name of Catoosa State Bank. \* \* \*." Said judgment was based upon findings set forth therein as follows:

"\* \* \* that the substantial rights of the Petitioners \* \* \*, have been prejudiced, because of the Board's and Commissioner's findings, inferences, conclusions and decision \* \* \*; that such findings, inferences, conclusions and decision are arbitrary and capricious ; are clearly erroneous in view of the reliable, material, probative and substantial competent evidence introduced, and matters properly noticed by such agency before said Board and Commissioner on March 17, 1964. \* \* \*."

The board, its members and officers, hereinafter referred to collectively as "Respondents", have perfected the present appeal on the original record.

In the brief of respondents attacking the court judgment appealed from herein, and in petitioners' answer brief, it appears to be agreed that the district court's review of the order of the Board and Commissioner was governed by section 22 of the herein-

before mentioned Administrative Procedures Act (Chap. 371, supra, p. 713; Tit. 75 O.S.1963 Supp., sec. 322) which sets forth in its paragraph "(1)", subparagraphs "(a)" to "(g)", both inclusive, the grounds upon which courts may determine that the "substantial rights" of the petitioners for review have been prejudiced by decisions of the State agencies, to which the Act applies. The hereinbefore quoted "PETITION FOR REVIEW" filed in the district court in this case was evidently designed to state substantially the grounds for review that are described in said Act in the following words:

"* * *

"(e) clearly erroneous in view of the reliable, material, probative and substantial competent evidence, as defined in Section 10 of this Act, including matters properly noticed by the agency upon examination and consideration of the entire record as submitted; but without otherwise substituting its judgment as to the weight of the evidence for that of the agency on question(s) of fact; or

"(f) arbitrary or capricious; * *.
"* * * *."

Many of the provisions of the Administrative Procedures Act, supra, were incorporated practically verbatim in the hereinbefore mentioned rules and regulations adopted by the State Banking Department on February 11, 1964, in obvious compliance with sections 2 to 5, both inclusive, of said Act (Tit. 75 O.S.1963 Supp., secs. 302–305, both inclusive); but it is not contended herein that such action of said Department, or that the Twenty-Ninth Legislature's enactment of said law, modified or repealed, or, in any manner, superseded or nullified the hereinbefore emphasized provisions of Tit. 6 O.S.1961, sec. 55. Therefore, it would appear that, by construing together the particular provisions of the two laws, and the Banking Department's rules, that were invoked by the filing, in the district court, of the petitioners' "PETITION FOR REVIEW", the proper prerogative of said

Court was to determine whether the "findings, inferences or decisions" of the Board and the Commissioner, as to the proposed Bank's "future earning possibilities" and "public necessity" were, as required by section 322(1), (e) and (f), supra (obviously alluded to in petitioners' petition and the court's judgment herein appealed from) "clearly erroneous in view of the reliable, material, probative and substantial competent evidence * * * (etc.)", and/or "arbitrary or capricious." If, on the basis of the considerations mentioned in said subparagraph (e), the findings, inferences, conclusions and decision of said State "agency", as to those matters, were not "clearly erroneous" or "arbitrary or capricious", then, under the mandate of Tit. 6, sec. 55, supra, it (the Commissioner and the Board) could not have approved the petitioners' application, but were relegated, by said Statute, to denying it, just as the court-reviewed decision and order did. In view of the wording of said sec. 55, it will be unnecessary to further lengthen this opinion by considering said denial from the standpoint of *both* "future earning possibilities" and "public necessity", since, if the Commissioner's and Board's order stands the test, invoked by the "PETITION FOR REVIEW" filed in the district court, and circumscribed by the provisions of section 322 (1), (e) and (f), as to one of those considerations, that court should have affirmed said order; and we must therefore reverse it on account of said error. Accordingly, we will determine whether the Commissioner's and Board's order was "clearly erroneous" or "arbitrary or capricious" under the cited provisions of section 322, supra, only as to the "future earning possibilities" of the proposed State Bank of Catoosa "at the place of business designated" in the application filed with the Banking Commissioner by the petitioners.

As hereinbefore shown, petitioners made no representation that such a bank would earn more than some $15,000.00 less than its expenses the first year of its operation, or that it would lose less than $6,550.00 its

second year. It will also be noted from Mr. Hicks' testimony that he admitted his estimate of the proposed bank's first year's expenses was "low", and that none of the organizers' estimates of its expenses for the first three years of its operation included anything for the cost, or rental, of a banking house, or place of business, and that that item of expense would probably amount to some $4,250.00 to $4,800.00 per year. When this item is added to the other contemplated items of expense, the margin between the bank's forecast annual income and expenses is further widened. It will also be noted that, although the hereinbefore quoted "Projections by Organizers" (included in the investigator's report) lists the proposed bank's total income and expenses for its possible third year of operation as "$50,950.00" and "$40,300.00", respectively, Mr. Hicks, while testifying under oath, stated only that the organizers believed such a bank could be "operating in the black" by its third year.

 It will also be noted that the population of Catoosa is still small, and it may be reasonably inferred that whatever marked population increase is expected, or hoped for, in the future, depends upon what effect, if any, completion of the U. S. Government's Arkansas and ˇ Verdigris Rivers navigation program in 1970, and the subsequent operation of a planned river port near the town, will have upon the population growth and economic health of that community and area. No evidence of just what can be expected along those lines was introduced. It was indicated that the bulk of such a bank's potential depositors and customers, with the probable exception of the Catoosa School System, will, on the basis of present conditions, necessarily have to be derived from other banks in the area that are within easy driving distance of Catoosa. We observe that there is no "reliable, material, probative and substantial competent evidence" in the record (made before the Commissioner and Board and submitted to the district court as a basis for its review of that State agency's order)

that any of the other banks' customers will leave them and/or become customers of the proposed bank. In fact, no exact, or approximate, basis for the figures used in the organizers' projections of the future earnings, or income, of the proposed bank is disclosed anywhere in the record. In this connection, it is called to our attention by respondents' brief that, as far as the evidence shows, none of the 559 persons (said to include both husbands and wives) signing the petition that was introduced in evidence asking the proposed bank charter to be granted, with the possible exception of the Superintendent of the Catoosa schools, has directly or specifically promised or represented that he or she would patronize such a bank. We have carefully examined the entire record and have concluded that since there is no question from the evidence, but that the proposed bank must lose several thousand dollars during its first two years of operation and that whether or not it will ever be a profitable operation is largely a matter of speculation and is dependent upon expectations which may, or may not, materialize in the future, it cannot be said that the findings, conclusions, and decision of the Commissioner and the Board are contrary to, or are not in accord with, the "reliable, material, probative and substantial competent evidence" in this case. It follows, therefore, that since "future earning possibilities" of the proposed bank constitutes, not only one of the "matters properly noticed" (to use the phraseology of section 322(1), (e), supra) by that agency of the State, but that said agency's unfavorable determination as to it, requires denial of applications like petitioners, under the provisions of Tit. 6, sec. 55, supra, no court could correctly hold the subject decision was "clearly erroneous" or "arbitrary or capricious", as the district court in this case purported to do. As the "substantial rights" of the petitioners were not claimed to have been prejudiced, by the order and decision of the Commissioner and Board, in any other respect, the district court committed error in its review of same. That court's judgment is therefore reversed, and

this matter is remanded to said court with directions to enter judgment affirming the Commissioner's and Board's order and decision.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, WILLIAMS and IRWIN, JJ., concur.