S. Paul HAZEN, John E. Painter, William H. Johnson, Lonnie R. Rex and Edward J. Preuss, Jr., as Incorporators and Applicants for Charter of Treasury Trust Company, Located in Tulsa County, Near Oakhurst, Oklahoma, Plaintiffs in Error,

v.

The BANKING BOARD OF the STATE of Oklahoma, (and its members) and Carl B. Sebring, Banking Commissioner, and Community State Bank, an Oklahoma Banking Corporation, Defendants in Error, (two cases).

Nos. 43464, 43465.

Supreme Court of Oklahoma.

Oct. 27, 1970.

As Corrected Oct. 28, 1970.

S. Paul Hazen, Tulsa, James E. Conatser, Bartlesville, for plaintiffs in error.

G. T. Blankenship, Atty. Gen. of Oklahoma, Gary F. Glasgow, Asst. Atty. Gen., Oklahoma City, for The Banking Board of the State of Okla. and Carl S. Sebring, Banking Commissioner.

Donald E. Hammer, Boesche, McDermott & Eskridge, Tulsa, for Community State Bank of Tulsa.

BLACKBIRD, Justice:

Plaintiffs in error, as the proposed directors and incorporators of a bank to be known as "Treasury Bank", signed an application for authority to engage in the banking business under that name. The application, with attached exhibits, was filed with this State's Bank Commissioner in November, 1968. The same day, the same parties, hereinafter referred to as "Applicants", filed with said Commissioner another application, by which they applied for permission to organize a trust company and for authority to engage in a trust company business, under the name of "Treasury Trust Company".

The proposed bank was to be located in a building formerly occupied by a drive-in eating establishment called "Johnny Reb's Pizza", at 5655 West Skelly Drive on Interstate Highway 44, adjacent to the unincorporated community of Oakhurst in southwestern Tulsa County, across the Arkansas River, west of the Tulsa city limits. The proposed trust company was to be located initially in the same building, though its articles of incorporation (as then drafted) contemplated that its Board of Directors might later move it to some other location in Tulsa or Creek Counties, with the approval of the Bank Commissioner, hereinafter referred to merely as the "Commissioner".

After the Commissioner's investigation, prescribed by Section 306 of the Oklahoma Banking Code of 1965 (Chap. 161, S.L. 1965, Title 6, O.S.1965, Supp., § 101 ff.), extensive hearings on said application were held before the State Banking Board, as contemplated in said section. At the close of these hearings, said Banking Board (hereinafter referred to merely as the "Board") entered its separate orders denying both applications.

In the order (entered in January, 1969) as to the application for authority to organize the Bank, the Board found that there were "conditions and factors" that did not afford the proposed Bank "a reasonable promise of successful operation", and mentioned at least some of such conditions and factors:

In its order, entered eight days later, denying the application for authority to organize a trust company and to engage in such business, as proposed, the Board gave, as its reasons for such denial, the lack of "real need shown", and referred to conditions in the area not conducive to supporting such a business.

Thereafter, when the proceedings before the Board were reviewed by the Court of Bank Review (upon Applicants' petition therefor), said court entered its brief orders affirming (in general terms) the Board's previous orders denying the applications. Upon consideration of the motions

for new trial subsequently filed by Applicants, that court thereafter overruled said motions by orders ostensibly contemplated to allow Applicants, in their present appeal from that court to this one, to "re-urge their position" as to what constitutes "substantial evidence" (under 6 O.S.1965 Supp., § 207, sub-section C) and "how far this court (the Court of Bank Review) should go in reviewing such evidence."

The two appeals have been consolidated by order of this Court; and this opinion is contemplated to determine the decisive issues in both.

Though extensive portions of Applicants' briefs pertain to the question of what character of evidence constitutes "substantial evidence" within the meaning of that term as used in the authorization conferred upon the Court of Bank Review by Section 207, subd. C supra, to reverse or modify the Board's order "if the court finds" the order "is not supported by substantial evidence", we find it unnecessary to deal with that question because the record made before the Board contains no proof that it erred in denying the applications, under the statutory mandate contained in Section 306, subd. F, supra, which provides in material part:

"  *    *    *    *    *    *

The Board shall not approve the application unless it ascertains to its satisfaction:

(1)    *    *    *    *    *

(2) that conditions in the community in which the bank or trust company would transact business afford reasonable promise of successful operation;

*    *    *    *    *    * "

In attempting to ascertain, "to its satisfaction", whether the conditions, under which the proposed Treasury Bank would transact business, affords it a reasonable promise of success, it is indicated in the Board's order that it carefully analyzed (among other things) the data and figures contained in the Applicants' estimates, or prospectus, of income and expenses of the proposed Bank. According to the "PRO-

JECTION" of the proposed Treasury Bank's earnings and expenses for its first three years of operation (which Applicants presented to the Board), said Bank would suffer net losses of $42,050.00, $18,950.00, and $21,050.00, respectively, during those years while earning gross incomes of $182,-500.00, $279,500.00, and $322,500.00, respectively. Included in these income sums were items of $60,000.00, $120,000.00, and $150,000.00, respectively, which were labeled "other income—service charges, etc." in Applicants' "PROJECTION", and added to other sums of estimated income to be derived from "Commercial loans", "Real Estate loans", and "Installment loans", and "Interest on investments", to make the above mentioned estimated total gross income sums. Of the total of 2,000 checking accounts, Applicants' "PROJECTION OF DEPOSITS" estimated the proposed Bank would have during its first year, it calculated that 900 would have average balances of less than $1,000.00, and listed 1,800 and 2,250, respectively, of such accounts in said Bank's second and third years of operation.

In its order, the Board prefaced its aforementioned finding (that conditions and factors do not afford the proposed Bank a reasonable promise of successful operation) with the following:

"The area at this time is not sufficiently developed to support another bank in this community. The Board is of the further opinion that the projection of earnings and expenses furnished to the board is unrealistic. We feel that the earnings will not be in accord with the projections, and we further feel that the expenses as projected are far too high for success in a newly organized bank of this size. To support our contention, we call attention to the fact that the employees' salaries the first year will run over $100,000.00 and under the proposed Bank's projection, the income will only be $182,000.00. In this connection, we believe the income from service charges is far out of line for a bank this size, and the losses will run much greater than projected.

"We also believe that the second year in operation under the projected figures will show a substantial loss, as well as the third year.

\*       \*       \*       \*       \*       \* "

■ We have carefully examined the evidence in this case and have concluded that, in some critical respects, it is very similar to that presented to the Board in Oklahoma State Banking Board v. Hicks, Okl., 412 P.2d 129, decided under our previous law (6 O.S.1961, § 55), wherein the factor, we are now dealing with, was described as "the future earning possibilities of said proposed institution at the place of business designated in the application." There we held, among other things, that the Bank Commissioner and the Board *cannot* approve such an application if their determination, as to that factor, is unfavorable. In that case (where, before creation of the Court of Bank Review, the appeal from the Commissioner's and Board's order was to the district court), we said:

"We have carefully examined the entire record and have concluded that since there is no question from the evidence, but that *the proposed bank must lose several thousand dollars during its first two years of operation* and that *whether or not it will ever be a profitable operation is largely a matter of speculation and is dependent upon expectations which may, or may not, materialize in the future,* it cannot be said that the findings, conclusions, and decision of the Commissioner and the Board are contrary to, or are not in accord with, the 'reliable, material, probative and substantial competent evidence' in this case. \* \* \* " (Emphasis added)

As the evidence in the present case possesses the characteristics above noted about the evidence in Hicks, supra, we conclude that the Court of Bank Review ruled correctly in sustaining the Board's denial of the application for the bank charter.

As to the application, also presented to the Board, for authority to organize, and engage in the business of, a trust company,

it was obviously made with the contemplation that "Treasury Trust Company" would certify and guarantee titles to real estate and attempt to obtain title guaranty business especially in counties of northeastern Oklahoma, as well as accept and hold property in trust, and exercise other duties and powers authorized for such corporations under 6 O.S.1961, §§ 294 and 295. The main thrust of the representations made to, and virtually all of the evidence introduced before, the Board, by the Applicants, appears to have concerned the fields of title guaranty insurance, and service as fiduciaries and counselers for church and/or religious groups. In this connection, Applicants represented to the Board that there is approximately a million dollars worth of title insurance premiums being collected in this State—"basically" in Tulsa and Oklahoma Counties—each year, and that, of the only three trust companies actively operating in this State, two are located in Oklahoma City and one in Ponca City.

As to the other above mentioned phase of Treasury Trust Company's proposed activity, Mr. F testified, as a witness for Applicants, that he is President of the Development Association for Christian Institutions, and he described the many years of experience he had had "in the field of non-profit organizations and fund developments" for that type of organization. Witness F told of the millions of dollars in so-called "deferred gifts" and endowments that had been received by a seminary, a college, a missionary society, and a university, with whom he had worked, and of the correspondence he has had "with over a hundred non-profit organizations and institutions", and of the inquiries he receives daily about helping donors of such gifts "get adequate service in setting up trusts * * *." Mr. F further testified about the problem of funding monies that come in to his organization, and stated, in substance, that institutions, who are his organization's clients, have had little experience in setting up trust programs for those who wish to donate funds to them. He stated that such donors "need a place to channel

their money * * *" so that it is "under proper custodianship". This witness further testified that he knows of no financial institution specializing in assisting non-profit organizations in their development funds; and the absence of such specialists was corroborated by other testimony.

On behalf of the Applicants, it was further shown that (though there are large banks inside the city of Tulsa, and in northeastern Oklahoma, that have trust departments) the only protestant bank now located west of the Arkansas River in, or near, Tulsa's outskirts, does not have a trust department.

On behalf of the protestant banks, Mr. B, President of a firm specializing in marketing programs for banks, testified that the majority of Oklahoma banks do not have trust departments, because that business is not generally considered a profitable operation. He indicated that this is the reason that only a few of the larger Oklahoma banks offer trust services. This witness gave testimony tending to refute Applicants' representations that small banks in Oklahoma would be a source of business for the proposed Treasury Trust Company, because of their fear of losing depositors to the large banks with trust departments, if those banks were referred to for assistance in such matters. By his testimony, Mr. B indicated that a company engaged in selling title guaranty insurance should be located so as to have convenient access to courthouse records and be near the hub of real estate transactions, and their financing. He testified that he failed to see how a trust company, operating as such, in the proposed location of Treasury Trust Company, "would have anything except problems"; and he expressed the opinion that, based upon the data before the Board, there was not enough justification for such a business, there, to make it economically feasible.

■ In view of the above described testimony, and the other evidence presented to the Board relative to such matters, we cannot say that the Board's order denying the

application to organize Treasury Trust Company, and to engage in a trust company business under that name, is without substantial evidence to support it. Accordingly, the Court of Bank Review committed no reversible error in affirming said order. That court's order and/or judgment is therefore affirmed, in addition to our previous affirmance herein of said court's order and/or judgment as to the application for authority to establish Treasury Bank.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, WILLIAMS, HODGES, LAVENDER, and McINERNEY, JJ., concur.